Jimmie Lee ALLEN, Plaintiff–Appellant,

v.

Thomas A. COUGHLIN III, Commissioner, New York State Department of Correctional Services, Charles J. Scully, Superintendent, Green Haven Correctional Facility, Dennis Bliden, Deputy Superintendent, Program Services at Green Haven C.F., jointly, severally, and individually, respectively, Defendants–Appellees.

No. 1616, Docket 94–2665.

United States Court of Appeals, Second Circuit.

Argued June 12, 1995.

Decided Aug. 24, 1995.

78

Gracelyn Leon, Lincoln Square Legal Services, Inc., New York City (Beth G. Schwartz and Patrick Finnegan, Fordham University School of Law Litigation Clinic), for plaintiff-appellant.

Rosalie J. Hronsky (Dennis C. Vacco, Office of the Atty. Gen., New York City), for defendant-appellee.

Before: WINTER, MAHONEY, and OAKES, Circuit Judges.

WINTER, Circuit Judge:

Jimmie Lee Allen appeals from Judge Preska's grant of summary judgment in favor of New York corrections officials Thomas A. Coughlin III, Charles J. Scully, and Dennis Bliden. Allen sought declaratory and injunctive relief, as well as damages, because prison authorities at Green Haven Correctional Facility twice removed newspaper clippings from Allen's incoming personal mail on the ground that they were contraband. The clippings were from Allen's hometown newspaper, the Camden, South Carolina *Chronicle–Independent,* and were, so far as we can tell, entirely innocuous.

Allen filed a *pro se* complaint challenging the seizure of the clippings under 42 U.S.C. §§ 1981 and 1983 as a violation of his constitutional rights to due process and equal protection.[1] Judge Preska granted summary judgment against Allen, holding that no genuine issue of material fact existed regarding the validity of the seizure of the clippings and, alternatively, that appellees were entitled to qualified immunity. Allen brought the instant appeal. We reverse and remand

the claims for declaratory and injunctive relief. We affirm the dismissal of the claims for damages an the ground of qualified immunity.

We briefly review the Department of Correctional Services ("DOCS") policies and rules concerning published items sent to prisoners. It is the policy of DOCS to:

encourage inmates to read publications from varied sources if such material does not encourage them to engage in behavior that might be disruptive to orderly facility operation. Accordingly, inmates shall be allowed to subscribe to and possess a wide range of printed matter such as books, magazines and newspapers, subject to the provisions of this directive, because these items may prompt constructive development.

7 NYCRR § 712.1(a).

DOCS policy with respect to published items sent or brought to prisons is found in Directive No. 4911, which provides in pertinent part:

Books, magazines and periodicals received from other than the publisher or an approved distributor may be delayed through the Package Room up to six days while being subject to close security inspection. All material is subject to Media Review guidelines.

Newspapers may only be received from the publisher or an approved distributor, subject to Media Review guidelines.

Prior to an amendment in 1987, Directive No. 4911 had provided that all written educational materials were subject to a publishers-only rule. As amended, Directive No. 4911 distinguishes between newspapers and other materials such as books, magazines, and periodicals. The latter publications may be received from sources other than the publisher or approved distributor but may be "delayed through the Package Room up to six days while being subject to close security inspection." *Id.* Newspapers, however, continue to be subject to a publishers-only rule.

---

1. Because the complaint was filed *pro se,* we read it broadly to allege also a violation of Allen's

First Amendment right to receive information.

The different treatment is based on the bulk of newspapers, which makes the review of article contents and the search for enclosed contraband more difficult.

The Media Review guidelines are set forth in DOCS Directive No. 4572. These guidelines contain provisions substantially identical to Directive No. 4911, limiting receipt of newspapers to those received from the publisher or an approved distributor.

Pursuant to DOCS Standards of Inmate Behavior, inmates are prohibited from possessing contraband, defined as "any article that is not authorized by the superintendent or his designee." 7 NYCRR § 270.2(B)(14)(xiv). Additionally, Directive No. 4911 requires that articles that do not conform to DOCS regulations be confiscated as contraband. 7 NYCRR § 724.2(e).

Directive No. 4422 sets forth DOCS policies and procedures governing personal correspondence to inmates. It provides in pertinent part:

1. All incoming general correspondence will be opened and inspected for cash, checks, money orders, or contraband....

\* \* \* \* \* \*

3. When, in the course of inspection, contraband is found

a. it shall be removed and either returned to the sender at the expense of the inmate, or otherwise disposed of as requested by, and at the expense of the inmate, if the contraband is not otherwise illegal; or

b. it shall be removed and forwarded to the security office with appropriate chain-of-custody documentation. When appropriate, the State Police shall be notified.

The clippings from Allen's hometown paper were seized as contraband because they were regarded as newspapers subject to the publishers-only rule.

Application of the publishers-only rule to news clippings was upheld in *Montgomery v. Coughlin,* 605 N.Y.S.2d 569, 194 A.D.2d 264 (N.Y.App.Div.1993), *appeal dismissed,* 83 N.Y.2d 905, 614 N.Y.S.2d 387, 637 N.E.2d 278 (N.Y.1994). The New York Appellate Division upheld the rule as to news clippings

because of the "logistical problem" in distinguishing clippings from full newspapers and the "administrative burden" in inspecting and reading each clipping for prohibited matter. 605 N.Y.S.2d at 571, 194 A.D.2d at 268.

Summary judgment may be granted only when the moving party demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The trial court must, in considering the motion, view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, *Consarc Corp. v. Marine Midland Bank,* 996 F.2d 568, 572 (2d Cir.1993), and may grant summary judgment only when "no reasonable trier of fact could find in favor of the nonmoving party." *Lunds, Inc. v. Chemical Bank,* 870 F.2d 840, 844 (2d Cir.1989). We review the district court's grant of summary judgment *de novo. Westinghouse Elec. Corp. v. New York City Transit Auth.,* 14 F.3d 818, 821 (2d Cir.1994).

■ In *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), the Supreme Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89, 107 S.Ct. at 2261. As we noted recently in *Giano v. Senkowski,* 54 F.3d 1050 (2d Cir.1995), a prison inmate "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Id.* at 1053; *see also Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 125, 97 S.Ct. 2532, 2537–38, 53 L.Ed.2d 629 (1977) (quoting *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974)).

■ In *Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989), the Court set forth three factors to be considered in balancing inmates' interests against those of correctional institutions: (i) "whether the governmental objective underlying the regulations at issue is legitimate and neutral, and [whether] the regulations

are rationally related to that objective," *id.* at 414, 109 S.Ct. at 1882, (ii) "whether there are alternative means of exercising the right that remain open to prison inmates," *id.* at 417, 109 S.Ct. at 1884, and (iii) "the impact that accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison," *id.* at 418, 109 S.Ct. at 1884.

Plainly, the present complaint cannot be dismissed on its face because none of the *Thornburgh* factors facially favor DOCS. Appellees recognized as much and submitted affidavits by various prison officials in support of the Directive. Based on those affidavits, the district court granted summary judgment.

■ We begin by noting that application of the publishers-only rule to clippings is, on this record, tantamount to a complete prohibition. Newspaper publishers generally do not run clipping services, and there is nothing in the record suggesting that professional clipping services would be treated as "approved distributors[s]" or are a practical alternative.

Regarding the first *Thornburgh* factor, the affiants justified the publishers-only rule for news clippings as rationally related to preventing the dissemination of inflammatory material that might threaten the order and security of the prison. The affidavits asserted that prison security would be threatened by news clippings pertaining, for example, to child pornography or the assembly of bombs. The affidavit of one prison official thus stated that the clippings "pose even greater problems than newspapers in connection with inspection and review because their source is not readily apparent." However, the affiants cited only one concrete example of a dangerous clipping—a fake article about an inmate's gang involvement.

■ Conclusory assertions in affidavits are generally insufficient to resolve factual disputes that would otherwise preclude summary judgment. *See, e.g., Hall v. Curran,* 818 F.2d 1040, 1045 (2d Cir.1987). The affidavits in the instant matter fall short of establishing the claimed danger from newspaper clippings. Newspapers received directly from publishers and ordinary correspondence may also contain inflammatory material. The record indicates that DOCS officials do not generally read prisoners' incoming correspondence absent some reason to believe that particular correspondence threatens the order or security of the prison. Instead, they open it and shake it to see if there is contraband. Indeed, ordinary correspondence may contain summaries of newspaper articles. The only distinction offered by appellees between ordinary correspondence and news clippings is that a news clipping may have more veracity than correspondence and thus a greater capacity for causing disruption. This may be true in some limited circumstances but it does not establish that news clippings are as a matter of law so much more threatening to prison security than ordinary correspondence that clippings should be essentially prohibited while correspondence goes largely unread.

Regarding the second prong of *Thornburgh,* the district court found that there were alternative means for inmates to receive particular newspaper articles, such as by requesting an interlibrary loan or by subscribing to newspapers. However, the record does not establish as a matter of law that these alternatives are effective. Subscriptions are not entirely substitutable for clippings because subscribing requires inmates to anticipate which papers might have articles that they like to read and to subscribe to all such papers. Subscriptions also require the expenditure of personal wealth in circumstances in which the ability to pay may be the exception rather than the rule. With regard to interlibrary loans, the affidavit of the DOCS supervising librarian stated only that a request for such a loan can be made but not that it will necessarily be honored. Moreover, a request for an interlibrary loan requires that the inmate know the particular paper and date of articles of interest.

The district court found, on the third prong of *Thornburgh,* that a policy accommodating Allen "would require prison staff to read each article that comes through the mail and would impose a particularly onerous burden on the prison staff." However, appellees' showing on this point does not justify

summary judgment. Clippings are far easier to examine for content than entire newspapers. Indeed, the stated justification for the publishers-only rule with regard to newspapers is that their bulk makes them difficult to inspect for content or concealed contraband. Clippings are far easier to inspect, and DOCS is certainly free to define permissible clippings—for example, by number of pages—in a way that prevents evasion of the publishers-only rule for newspapers. The degree to which the cost of such review is burdensome is an issue of fact not resolved by the conclusory affidavits submitted. We thus cannot say as a matter of law that a change in official policy would precipitate an avalanche of newspaper clippings at the prison.

Giving the full measure of deference to the judgment of prison authorities, *see Benjamin v. Coughlin*, 905 F.2d 571, 579 (2d Cir.), *cert. denied*, 498 U.S. 951, 111 S.Ct. 372, 112 L.Ed.2d 335 (1990), the validity of the publishers-only rule for news clippings is not established as a matter of law on this record.

We thus do not agree with the *Montgomery* decision. With regard to the "logistical problem" of delineating clippings from full newspapers, 605 N.Y.S.2d at 571, 194 A.D.2d at 268, we see no legal or practical barrier to an exception for clippings that contains a limit on the number of pages. With regard to the supposed need to inspect and read each clipping, *id.*, the appellate division never considered the very different treatment accorded private correspondence. We therefore decline to follow *Montgomery* on the present record.

■ We turn now to the question whether appellees are entitled to qualified immunity as a matter of law. The doctrine of qualified immunity protects government officials from liability for money damages in actions arising out of performance of their discretionary functions. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). It does not bar declaratory and injunctive relief, however, which Allen has requested. *See id.; Giacalone v. Abrams*, 850 F.2d 79, 84 (2d Cir.1988). Even if established, therefore, qualified immunity is not grounds for dismissing all of Allen's claims.

■ Allen's claim for damages is on a somewhat different footing. As a general rule, government officials are immune from liability for money damages under Section 1983 unless they violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738. In determining whether a right is "clearly established," we have considered three factors: (1) whether the right was defined with "reasonable specificity," (2) whether the decisional law of the Supreme Court and this Circuit support the existence of the right, and (3) whether a reasonable defendant official would have understood his acts were unlawful. *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir.1993) (quoting *Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir.1991), *cert. denied*, 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992)).

■ We believe that appellees are entitled to summary judgment on qualified immunity grounds with regard to Allen's claim for damages. That inmates have a First Amendment right to access to publications consistent with prison security is clearly established. *See Abdul Wali v. Coughlin*, 754 F.2d 1015, 1030 (2d Cir.1985) (First Amendment right to "receive information" entitled to special solicitude). Appellees' evidentiary proffer in support of their claim that clippings may be barred seems to us conclusory and insubstantial. Nevertheless, the appellate division upheld the publishers-only rule with regard to clippings in *Montgomery*, and we cannot say that appellees should have been more prescient in anticipating our reaction.

We therefore reverse and remand the claims for declaratory and injunctive relief. We affirm the dismissal of the claims for damages.